All right. Our final case for the day is, uh, United States v. Miller, uh, Mr. Cowden. Good to have you here, sir. Thank you, your honor. May it please the court. Good morning. Good afternoon. I thought one of the easiest ways to start is with an argument that I think is the clearly, the argument that clearly requires reversal in this case. And I think one of the important things to look at in this case is there's two real properties involved in this case. Both properties have been seized or restrained by the government. And the allegation is that, uh, these real properties, the entirety of these real properties are subject to forfeiture under a money laundering theory. So if we look at one of the properties, both properties, the court knows were purchased by Mr. Miller, one in Virginia and one in Delaware, one in Virginia, one in the Delaware property was purchased in 1997. And there's no evidence in this case that any money, dirty money was used to purchase or acquire the Delaware property. The Virginia property was purchased in 2000. There's no evidence that the mortgage payments that went to the balance on the loan were used to pay the Virginia property. The Virginia property had an interest only loan, a subsequent interest only loan. Dirty money was traced to the interest payments, but not to the equity. But let me turn to the Delaware property because that's the, that would be the proverbial two foot putt in this case, the Delaware property has the government's argument is about $58,000 of home improvements were paid to contractors who worked on the Delaware property. So even if this court assumes as the trial court did that $58,000 is directly traceable to equity in the Delaware property, the rest of the equity in that property is not proceeds and that property that, that that's, let's just take the equity out of that and say, what's the rest of the property? The government's theory for the rest of that Delaware property being subject to forfeiture is that that property was involved in facilitating money laundering. Here's the problem. Their evidence is they say that Mr. Miller's wife used her laptop computer to send a couple of emails from the Delaware property. So if this court wants to take the position that using a computer that's located in one's home makes that home subject to forfeiture, then I'm wasting my time, but that can't be. This court needs to say, as a matter of law, we are not accepting that proposition. It's not the computer facilitated money laundering, arguably, but not the fact that the computer happened to be located in a home or in a Starbucks or at a car or wherever else you can send an email. And here there's really no evidence that the computer was even in the home. Let me back up here. Government has a burden of proof, not me. Government has a burden of proof to show that both properties are subject to forfeiture on the basis of the forfeiture allegations in the indictment. I actually have some sympathy for your argument about the computer, but haven't we used that very fact to support extending a probable cause for a search to a home on the theory that most professionals work at home, they work from their computer at home. We've done, we've looked at that with accountants, I believe, and attorneys. Well, Your Honor, looking for probable cause to believe that evidence is located in a home because the computers or the records are located in a home. It's not the same as saying probable cause to believe that the Delaware property facilitated a money laundering conspiracy. The theory for the facilitation of the money laundering conspiracy. Probable cause is not a high bar, even in this context. But facilitation is not, facilitation has meaning. One of the, I didn't cite, and I should have cited a case, and I think this court needs to look at this case as well in terms of facilitation, because it's a unanimous Supreme Court reversal of a fourth circuit decision talking about facilitation. The cases of Walhauta versus United States, A-B-U-E-L-H-A-H-A-W-T versus United States, 556 U.S. 816, 2009. This is a unanimous Supreme Court decision rejecting the government's argument that facilitation has the broadest meaning possible. It's not just the facilitation theory. We have cases in the fourth circuit, and I turn the court to the two tracks of real property case, 998 F-2nd, 2004, fourth circuit, 1993, where the government took the fact that land was used to shield a marijuana operation from public view, but the court, this court said, the mere fact that land tended to shield marijuana activity at a marina from public view did not make it forfeitable, nor did the fact that the land provided a means of access by which contraband reached a public highway make it forfeitable. When we're talking about facilitation, there has to be a substantial connection between the property and the offense of forfeiture.  Is not a substantial connection. So that's it. That is the basis. That's all the district court found for the Delaware property. Two conclusions, $58,000 of proceeds because property went to pay some contractors, and he assumed there's a dollar for dollar increase in the value of the equity if you spend 58,000 on a contractor, your property is worth 58,000 more, no basis for that conclusion.  You agree that everything in the indictment is supported by probable cause? I'm not challenging. The indictment, Your Honor, says, I don't know. No, I mean, I don't know. I agree that the grand jury returned an indictment. I didn't see what the grand jury was instructed. Here's my problem. What difference does it make? The grand jury indictment is probable cause. Probable cause to believe that the defendant committed the activities and the grand jury found probable cause to believe that the properties are connected. But that doesn't mean that the trial court can't and doesn't have an obligation to look to see if the properties are in fact, substantially connected to the activity. What the indictment alleged? Did it allege they're connected? Well, let's take the indictments of verity. It didn't allege a connection. The grand jury indictment is a verity. It's there. So, Your Honor, if we take that assumption, don't go behind it. Well, you can't go, I don't think, you can't go behind it. I don't think a district judge can go behind it. The Supreme Court actually says that when, when the government has seized assets that somebody needs for fees, you need to go beyond the indictment a little bit. You have to look to see if the properties are in fact, substantially connected to the offense of conviction that supports a forfeiture. And so for the, for the Delaware property, I say it's an easy case because the best- The allegations in there are supported by probable cause. Well, there's no allegation in the indictment, Your Honor, that anything occurred in the Delaware property. There's no allegation that a computer was used in a Delaware property. There's no allegation that the Delaware property was purchased in a money laundering transaction. What the indictment includes is a series, is an allegation that there was a money laundering conspiracy. And then it lists a bunch of what- They went beyond that and had a hearing and he had on experts and all that stuff. Right? We had- They had the FBI agent come in there. They did not, Your Honor. They had a, they had an accountant who works for the FBI. That's it. There were improvements on the Delaware property. There were- $258,000 for total. And they say that's proceeds, that there were proceeds that were used- Were there payments on a note for the property then? No, Your Honor. No evidence that the Delaware property was completely owned for inflict. We've got cases that say when you commingle funds with property, uh, then  Your Honor, the purpose of the commingling has to be to conceal the property, the dirty money, the whole point of the money laundering transaction. We have two kinds of money laundering transactions. We have the 1957, which says, if you spend- Who says it wasn't for that purpose? Well- Putting the $58,000 in, who said it wasn't? There's, there's court, there's case law from every circuit that says if you're just merely spending money, it's not money laundering. Just merely spending dirty money is not money laundering. But they weren't taking $58,000 and putting it there so that you can conceal it. Well, they didn't do that, Judge. What they did is they put $58,000 into, they gave $58,000 to a contractor. That's where the dirty money allegedly went. Are you objecting to the applicability or the reliability of the lowest intermediate balance rule? Are you objecting to the methodology that the accountant utilized to determine how funds moved in and out of the account to pay what? It's not relevant to my argument today. So no, I mean, I don't think she applied it right, but it's not relevant to this argument. The intermediate balance rule, for example, if I, if I go back to the Delaware property, 58, if we assume that she did the intermediate balance rule correctly and assume that $58,000 of dirty money can be traced to payments to contractors, we can assume that there's $58,000 of proceeds. That doesn't mean that the whole property is subject to forfeiture. The point is, back to Judge Wint's example, the spending of the money in a 1956 concealment case, the spending of the dirty proceeds has to, the purpose of that has to be to conceal. Here, the purpose of the, of the, of the, of the spending is allegedly to do some home improvements. That's not any different than spending dirty money to pay an electrical bill is not money laundering. It's just spending money. If you spend $10,001 of dirty money. It will be if the electric bill keeps the lights on for a drug den. It's it, then it, then it's a, you're honored. Judge Duncan, you're correct. If the theory of money laundering is promotion. So if I'm spending the money to keep the lights on for a drug operation, I'm promoting, there's a money line. So 19, 1956, with respect to my hypothetical, my analogy. So let's carve out 1957 for a second, which is the spending of dirty money over $10,000 an amount that spending is a money laundering transaction, regardless of your intent. But we're not in that one. We're in the 56 in the 56 context, the spending has to be the purpose of the spending has to be to either conceal or promote. So if you're spending dirty money to promote, uh, the unlawful activity, the electrical bill, then it's a promotion. We don't have a promotion here. We have a concealment money laundering charge. So the spending of the elect, the spending of money to pay an electric bill is not a concealment. It's just spending money. And there are dozens of cases from all the circuits. And I've cited some in my brief, and I can certainly say more that say you have to have more than just spending money. Otherwise what we've done is we've turned every 1950s, what's the point of a 1957 then? We don't even need it because 1956 covers any spending of dirty money. The spending has. Virginia property. State. Uh, that simply means that if you've got a deed of trust on the property, it transfers the title. So when you make payments on that note, aren't you in fact making payments with this money to help to acquire the property? Well, Your Honor, the, the, what they're seeking to forfeit, the property was already owned by Mr. Muller. I understand that, but Virginia is a title theory state. I'm not sure I understand that. Deed of trust on it and title transfer. Um, you're, you've got an argument that. Then if you make the note, pay the note, you then are making payments on the property to acquire the property. Cause once you, once you pay the deed of trust off, you note the title didn't transfer is back in order to do that. You've got to pay the note off. Your Honor, if that's correct, that wasn't brought up in the district court and we could go back and revisit that issue at the trial court. It didn't come up. It didn't come up in the briefing. It didn't come up at all. Didn't come up at all. And what we, what we discussed in the, in the, in the case of the Virginia property was that the payments were only interest. The government said they came up with a, there's a case that they cited, uh, in their briefs that said, well, let's look at distinguish between interest payments on a balloon mortgage and payment on that pays principal and interest. Well, if under your title theory, I don't know, Your Honor, I don't know the answer to that. We may need to go back and revisit that. But why should we distinguish? Because the, there's no evidence that the payment on the balloon note increase the equity of the property. And if there is, we don't know how much. So, so what we do know is that when, when Mr. Miller sold that property, he paid off the balloon note, all of it to 650. We're paying down on a principal, but, uh, increased value that occurs by owning that property. It does in fact, could have most places going to have equity increases. The fact that you were able to maintain the ownership of that property by paying off the interest on a note, which allows you to continue to hold that property over a period of time, uh, if you did it over a period of years, you may not pay it in a principal down, but you may in fact have increased the equity. And that's, there's some speculation there, Your Honor. But again, the trial judge didn't look at this and say, okay, let's look at, let's look at how much equity did Mr. Miller have in the Virginia property before the note even came into, into And then let's look at how much equity went up and then let's do a calculation to figure out if we can figure out how much went, what he, the judge did is he said, well, they've traced $300,000 of, of, uh, of interest only payments to Mr. Kaplan. And so we're going to give them $300,000 of Mr. Miller's equity in his property, even though he had at least eight or 900,000, $800,000 of equity in the property, probably more when the So what's the basis for this dollar for dollar when they offered the Rafferty case as their, as their basis for it, the Rafferty case said, let's look at how much money went into the principal. That's what we want to focus on. And it didn't work in our case because no money went into the principal. So the, the calculator or the, the, the argument that you've, you've, you've raised is not an argument that the government presented. It's not an argument that the trial court did. The trial court just said, all right, they've traced proceeds to people. And we're going to say that the proceeds can be glommed on to the real estate without finding us a formula for that. And that's the problem. Isn't that's exactly what they didn't do. That's the, I'm having problems with your premise. And, and also, uh, at least Mrs. Miller process money through accounts to pay toward improvements on property, which certainly increased the value of the property. I'm talking about the Delaware property now, specifically. We are, and we have no evidence that, I mean, to say it certainly increased the value. We have no evidence that it did increase the value, let alone how much, but even increase was due to the monies that were funneled through the accounts and paid toward it using the methodology propounded by the accountant. No, the accountant didn't use the account. The only methodology the accountant did was say that she traced money that she said was dirty to the, uh, to the, to, to the home improvement company. I thought that accountant also said that money was that, um, Mrs. Miller moved money through accounts to make payments. The, so the accountant's theory is twofold. First, she said she traced money through the accounts and then into the hands of the home improvement person in the, or the home improvement company in the Delaware property, $58,000 worth. Okay. So that's it. And I could be wrong about the movement through the accounts. I'll check. So she did testify guilty to all of it. Miss, uh, well, actually there's an issue there as well. Um, Mrs. Miller pled guilty. She pled guilty to a conspiracy to defraud one company, Skylink, with my client, a conspiracy to defraud Skylink. And that was to the tune of several, I think, several hundred thousand dollars. The other, the other, the other two overt, the other two acts that she was involved in, she said those weren't conspiracies. He didn't know about those. They stole money from two other people. And that was not part of the conspiracy. It was part of an overt act. So when we did the whole forfeiture at the ancillary proceeding, and they tried to forfeit his property and her criminal case, which they knew he owned, not her, as substitute assets. I said, you can't forfeit his property as her substitute assets. But we also attacked the basis of the other two charges to say that she didn't plead guilty to those. So that's not the offense of forfeiture. The offense of forfeiture is smaller, but that doesn't matter here because now what they've done is they've gone back and said, well, we're going to indict him for all of it. So they've indicted him for the one she said she did alone, as well as the one she said she did with him. So we do have that world, but we still have as a, and I'll go back to the Delaware property as the easy case. We still have the problem of that property is not a property that was involved in a money laundering transaction, unless you can say with clear conscience that using a computer in a home is enough to, enough to facilitate a money laundering conspiracy. And if, if that's our position here, I submit we're standing alone and far out and far out from the, from this court's decision in two tracks, the two tracks case, which said, no, you can't just, just because the computer is used in the house and some, somebody can't see the computer screen. I don't know, Your Honor, it looks like it's a, it's a civil forfeiture case by the name of the case. So, yeah, I think it's a civil forfeiture case. I see my time is up. You take some time. We're generous with you today. I'm a pushover for these lawyers. Mr. Mr. Kronberg. Good afternoon, Your Honors. Would you just get into this thing? You're named on this pretty red brief. That is true. Uh, with me at counsel table is Mr. Esonwune and Ms. Taylor who are on the brief. And I was brought in, I think, uh, to unnerve Mr. Catton because he used to call me for advice when he was in AUSA. You're the expert today. I was, but maybe I am today. In any event, I think there are a couple of things that, that could be cleared up very easily. The first, the idea that the Delaware property was, uh, was in, is subject to forfeiture only because of facilitation is not correct. It's not close to correct. As Judge Ellis found the $58,000 of drug proceeds, excuse me, drug proceeds, fraud proceeds that were put into the property in improvements. That counted as money laundering. Those were money laundering transactions as alleged in the indictment over acts in the indictment to, to, uh, sending that money and the act of investing the money for improvements constitutes makes the property involved in money laundering. And I will say that Judge Wynn wrote this in the Kavon case a few years ago. And in the Kavon case, uh, Judge Wynn wrote, uh, consequently when legitimate funds are commingled with property involved in money laundering or purchased with criminally derived proceeds, the entire property, including the legitimate funds, is subject to forfeiture. But the issue that opposing counsel takes is that it was involved in. Correct. And, and, and the reason it's involved in is that the money, the, the SUA proceeds specified in lawful activity proceeds, the proceeds of the fraud are used to acquire improvements in the property. And that is the transaction that involves a property. But I would like to finish what Judge Wynn wrote, which was he cited, see United States versus one single family residence at 15603 85th Avenue, which is an 11 circuit case from 1991 that, and then Judge Wynn wrote parenthesis stating that if one is a wrongdoer, any amount of the invested proceeds traceable to drug activities forfeits the entire property. So it doesn't matter here that it was only $58,000 that was invested in improvements in the Delaware property. Because the property was involved in the acquisition of the improvements that the SUA proceeds, the fraud proceeds were invested in improvements in that property, the entire property is subject to forfeiture. Now, the question about the facilitation is, I mean, that's a separate question. And I believe, and I agree with Mr. Katton, it's a tougher question. I think the government wins on it. I think that Judge Ellis was correct and Judge Ellis correctly distinguished the two tracks, a case that Mr. Katton mentioned before, but I don't think this court even needs to go near the facilitation issue because by this court's decision in Kavunk, it's, it's a done deal as in my opponent's words, a two foot putt that $58,000 of fraud proceeds used to purchase improvements in the Delaware property mean at this stage, that's sufficient to restrain the entire Delaware property. You don't need to look beyond the indictment? You can look beyond the indictment. They had a farmer hearing and all that, but is the indictment of Sandalone, not? Almost Judge. I, Mr. Katton is correct that I think the defendant is entitled to challenge whether it is legally sufficient. The facts alleged are whether, whether it's legally sufficient. If for example, the use of money to purchase improvements at the Delaware property legally could not constitute involved, could not legally mean that the property was involved, then I think he could challenge it, but he cannot challenge the allegation that the property was involved by reason of the investment of $58,000 to improve it. So the Dover acts were part of the conspiracy. Correct. Correct. And also we had, we did have the hearing and this, the government listed 54, uh, separate uses of the money that constituted the money laundering. A number of them totaled the 58,000 to the Delaware property totaled the 300 something thousand to the Virginia property, and they were not contested. Excuse me. They were contested to the extent of $6,000 in Delaware property and $30,000 on the Virginia property. But 90% of the money that the, that the FBI accountant traced of S of fraud proceeds that were traced into both properties was not disputed. So that really isn't in dispute. And your honor is correct that once the indictment says that once the indictment alleges that the properties were involved in money laundering. Uh, and on this basis that we know is legally sufficient, the investment of improvements in the property is sufficient, then that, that is all that is. There's no evidence to show that it was intent to conceal the money. And that is exactly what is irrelevant at this stage. It's irrelevant for two reasons. First, the Supreme court's case decision in Cayley says that is the finding of the grand jury of the grand jury that you cannot touch. The grand jury said, we find that those transactions were designed to conceal when the, when the Millers sent the money from, what is that case in the Supreme court? Cayley, K-A-L-E-Y. That was from 2016. I think it's, it's in our briefs. It's like Costello a lot back in the forties. Right. Couldn't be questioned. Well, and, and, and, and, so, so what happened? Cayley was a case involving, uh, a defendant who said that you cannot restrain my assets pretrial because, uh, uh, I need them for attorney's fees. And, uh, they couldn't, it wasn't a forfeiture case per se, but it was a different, it was a different kind of restraint. And the Supreme court said that you cannot challenge the, uh, uh, you cannot challenge the finding of the charge of the allegation. You can challenge the nexus between the property and the charge, but you cannot challenge the charge. I'd like, I'd like to turn to one other point about this interest only loan. Uh, and I think Judge Witt, again, you hit it right on the head. What the defendant had argued conflated principle and equity. The principle balance of the loan in a balloon loan never changes. The principle balance in this loan stayed at $650,000. However, every day, every month they were supposed to pay interest on it. And by and large, the interest was paid. But when the loan, when the property was sold in 2016, the payoff was not 650,000. The payoff was 686,000. And that's because as interest accrues, the lien holders lien expands to take up more of the equity of the property value and the owners, the borrower's equity shrinks, and every time he pays interest, the borrower's equity increases dollar for dollar with when he pays, makes an interest payment. So as any of us know, from ever having sold a house, the amount you get at the, it depends on what day of the month you sell the house because interest accrues daily and affects your equity. And every month in this case, he was paying, he was due $8,125 in interest. Every month, the equity in that property went down $8,125. And when he paid that interest, his equity went back up $8,125. So it's, it is a, it's a misconception to suggest that payments on an interest only loan don't affect equity. They do affect equity dollar for dollar. No, go ahead. I just want to let you know, that's a very novel argument. I've never heard that one before. That's why they call me, Judge. I'm sure. Go ahead, Judge. I'm sorry. No. Um, what is that? So what is the analytical relevance of the fact that Wallace sent over 50 emails regarding money laundering transactions from the properties? Why, what does that, how does that relate either to, uh, traceable to, or involved in, what is it? It has no relevance to traceable to. It has, it has relevance to involved in, in the sense that court, this court, among others, has said that a property's use to facilitate a crime constitutes being involved in the crime. In the Schiffarelli case, which is about 25 years old, it was a drug case. And it was a doctor who was writing prescriptions from his office and house office, I think. And, and the, the holding was that the use of his office to write those prescriptions meant that the property itself was subject to forfeiture as having facilitated, uh, facilitated the offense. Similarly, with respect to other professionals who routinely maintain home office sites from which they do work. But I believe Mr. Your opposing counsel's argument was that that's a different, the fourth amendment, it's a different analysis. I think, I think what he's really arguing is an eighth amendment, excessive fines case, uh, making an argument that it would be excessive, that even assuming he would say, even assuming that the property is used to facilitate the crime by writing, by, by, by, by using the computer there, it would, it would be an excessive fine to, uh, forfeit the house on the basis of, of using the computer in that house to send a few emails. And there may be, uh, some merit to that argument in a different case, but an excessive fines argument makes no sense in this case because the victims, the autism charity, the state senator and the, and, and, and the, and the Skyling company were out over $1.4 million and the total amount restrained in this case is less than that. So there cannot be an eighth amendment issue here. So the, if, uh, as a legal matter, the use of property to facilitate a money laundering offense by giving cover or a place, a place from which the money laundering transaction can occur, that is clearly by long term, long precedent that could, that makes a property involved in the money laundering. Whether it should be forfeitable because of the limited nature of the transactions of, of, of the facilitation. That's an eighth amendment issue, which doesn't go anywhere in this particular case. If you have no other questions for me, I will cede the rest of my time. Thank you very much, Mr. Kronberg. A couple of things. Um, I'm not making an eighth amendment argument here, excessive fines analysis. Uh, I go back to, there's plenty of cases that say, look, we're not even talking about facilitating property when the, when the facilitation is so incidental. And I'll go back to the two tracks case. We get to some incidental facilitation that doesn't matter. So let me turn to the argument that, that, that, that, that I understand the government to be making now, which is this argument that, that there was a conspiracy to, uh, to, so what they're trying to say is let me distinguish the mere spending cases and say, what we do have here is we have a conspiracy to invest $54,000 into the Delaware property to hide it. I'm sorry. I, I honestly don't quite grasp the distinction you're drawing between spending money and in, in paying for improvements in a home and that just somehow just spending money is not, uh, is not utilizing the proceeds, it's not utilizing dirty money. Utilizing. Okay. Your honor, utilizing dirty money is not money laundering. You have to engage in a financial transaction, like a spend with the dirty money. The argument is that you, uh, engaged in the transaction to renovate the home. To renovate the home. And if the purpose is to renovate the home or to turn on the lights or to put gas in the car so we can run the car, that's not money laundering. That's just money spending. I don't understand that distinction because if you were to take the money, the proceeds from any kind of, um, illicit transaction and put them toward the improvement of a home, the repair of an automobile, the result, the, the entity that was improved would nevertheless be improved with the dirty money, money, money in that, that would subject it to forfeiture. That's why I'm having trouble. All right. Let me, let me give me an example that might work here. If we take dirty money, criminal takes dirty money, SUA proceeds, and buys a hot dog. We're not going to say that's a money laundering because, because it's disposable, it's consumable. It doesn't go to increasing the equity in an asset that you are trying to convert. So if you're saying, am I taking the dirty cash, but here, this is why. That's the easy case where we say not money laundering. The hard case is if we take the cash and we say, okay, we're spending the dirty money on, on the lights. Again, consumable, it's gone. But so, so there's no way to say that that spending is a money laundering transaction. What do you base this distinction on? If you're taking the dirty money and you're saying, so the easy case would be if I'm taking cash and I say, okay, now I want to launder this cash. So what I want to do is this is fraud proceeds and I don't want the government to catch me with the fraud proceeds here. So I'm going to turn them into real estate. I'm going to go buy a house now with my fraud proceeds. So it looks, the cash now looks like real property. You've changed the form of it. And I did it with the intent to hide the value of the cash. You're saying that it's, it's a, it's an intent you have to show. Intent to conceal in the spend. I have to have an intent to conceal, not just an intent to spend. This case is probable call. Right. And if you look at the indictment. So let's go back to the indictment. There is nothing in the money laundering indictment that says that the, that the, the money that was given to these home contractors was part of a conspiracy to raise the value of the Delaware property so that someday they could sell it for more and hide the assets. The distinction being with the probable cause is that this is different than having to go through the trial itself where the, at least proving the offense itself is not what's necessary at the forfeiture stage, at least that seems to be the position on the other side. Well, I think the position from the government counsel who just came up here is that there might be some theory that we might've told the grand jury that might've worked to get this indicted in a way where the grand jury could have said, and we find that the $58,000 was moved into contractors to move money to the equity of the house in a way that would hide it. That didn't, the grand jury didn't. I mean, that's not in the indictment. There's nothing, there's no, when you look at the, what the indictment includes is a bunch of financial transactions where money's moved. And when we did the hearing and I asked the accountant about one of these, she didn't even know, again, back to money laundering, you have to have proceeds before you can launder the proceeds. I asked her why she thought there was an intent to conceal. And she said, because Mrs. Miller took money from the account that she wasn't supposed to spend money from and moved it to her personal account and then spent it from there. And the point there is when the money was moved to her personal account, that's when it was stolen. So you can't say that she moved the money into the account to steal it and conceal it at the same time. That's the merger problem that I've discussed. You've got to have proceeds before you can launder them. Well, this witness couldn't impeach the indictment anyway. I mean, if she got up there and said there wasn't probable cause, she couldn't hurt the indictment, even if she's testifying for the government. But Judge King, if... The indictment is the indictment. I understand. But if you look at this indictment, there's nothing in this indictment that says that the $58,000... I'm just speaking in the abstract. Right. You can bring all the witnesses in you want and impeach the indictment, but it doesn't help you. But the indictment doesn't say that the finance... The indictment doesn't help you. Right. The indictment stands on its own. Well, the indictment says that... If it says it, say it. The indictment says that these two individuals engaged in a money laundering conspiracy, whatever that means. I don't know what that means. Then they list a bunch of transactions where money's moved from one But it doesn't say anywhere that the purpose of this indictment or the purpose of this transaction, the $58,000 that was given to Home Improvement, was to hide the fact that, hide into the equity of this home, some $58,000 or some other amount, whatever it is, into that home. You did. Thank you, Your Honor. Appreciate it. Thank you very much. Thank you.
judges: Robert B. King, Allyson K. Duncan, James A. Wynn Jr.